IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

TIMOTHY L. PHILLIPS,                    :        Case No. 1:13-CV-02590

      Plaintiff,                       :

v.                                      :

COMMISSIONER OF SOCIAL SECURITY,        :        MEMORANDUM DECISION AND
                                                 JUDGMENT
      DEFENDANT.                       :

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636 and FED. R. CIV. P. 73, the parties to this case have voluntarily consented to have the undersigned United States Magistrate Judge conduct any and all proceedings in the case, including ordering the entry of a final judgment. Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for a period of continued disability and continuing disability insurance benefits (DIB). Pending before the Court are Briefs on the Merits filed by both parties (Docket Nos. 17 & 18). For the reasons set forth below, the Magistrate reverses and remands the case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

## II. PROCEDURAL AND FACTUAL BACKGROUNDS.

On August 26, 2003, Plaintiff filed applications for DIB and SSI, alleging that he became disabled on June 12, 2003[1] (Tr. 282, 340-347). The applications were denied initially (Tr. 47-49,

---

[1] The actual applications were not available for inclusion into the record (Tr. 1, 3).

54-56) and upon reconsideration (Tr. 282).  Subsequently, Administrative Law Judge (ALJ) Dean

K. Franks conducted an administrative hearing on October 13, 2005 in Cleveland Ohio and on

November 14, 2005, he made the following findings of fact:

- For the relevant time period based upon Plaintiff's residual functional capacity and vocational factors, there are no jobs existing in significant numbers which Plaintiff can perform.
- Plaintiff has been under a disability since June 12, 2003; that he is entitled to a period of disability commencing June 12, 2003; and that his disability has continued at least through the date of the decision.
- Plaintiff contended that the work listed on his earnings record for 1990 to 1995 was in error so the ALJ directed the District Office to investigate that portion of Plaintiff's earnings record and noted that Plaintiff may not be eligible for Title II benefits if the earnings record was amended.
- It is recommended that a medical review be conducted within one year of the date of the decision (Tr. 278-287).

A continuing disability review was conducted on March 25, 2009, during which it was

determined that:

- Plaintiff had undergone a gastric bypass in 2007; he had lost approximately 150 pounds; he had a successful hernia repair; and his level of daily activity had improved.
- Plaintiff's heart function was normal and his cardiac condition had remained stable.
- Plaintiff was noncompliant with the prescribed treatment.
- Plaintiff's health had improved and he was able to work starting in March 2009.
- Plaintiff's last check would be disseminated in May 2009 (Tr. 289-296).

Plaintiff requested reconsideration on March 31, 2009 (Tr. 297-298),  and on October 6,

2010, Plaintiff and his aunt appeared and testified before a disability hearing officer who prepared

and issued a reconsidered determination.  Upon review of the testimony and medical and vocational

information, the hearing officer determined that in addition to the existing impairments–obesity and

ischemic heart disease–Plaintiff had related physiological and/or psychological  issues:

- Renal disease.
- Possible cholecystectomy
- Possible cataracts.
- Seizures.

2

- Stents inserted in his waistline.
- Medication dependent depression.
- Reclusiveness (Tr. 297-310).

The disability hearing officer concluded that medical improvement had occurred since the comparison point (CP) of November 14, 2005 and that the disability requirements were no longer met (Tr. 311-322).  On December 16, 2010, the Social Security Administration (Administration) issued a "Notice of Reconsideration," affirming the hearing officer's findings that Plaintiff's health had improved and he was able to work (Tr. 323-324).  On December 29, 2010,  Plaintiff requested a hearing before an ALJ (Tr. 327-329).

### III.  THE ADMINISTRATIVE HEARING.

On August 14, 2012, ALJ Patrick Rhoa conducted a hearing at which Plaintiff and a Vocational Expert Carol Mosley appeared.

#### A.      PLAINTIFF'S TESTIMONY.

Plaintiff conceded that he had lost a significant amount of weight after undergoing gastric bypass surgery and that he had some success at long-term weight maintenance.  During his testimony, Plaintiff contended, however,  that he had five impairments, which collectively demonstrated that his condition was severe; that his condition was not subject to improvement; and that his condition continued to deteriorate.

First, Plaintiff testified that he had two heart attacks while working (Tr. 753-754).  Second, Plaintiff's dosage of Risperdal, a medication generally used to treat schizophrenia and bipolar disorder, was increased to assist him maintain a calm demeanor and neutralize  his tendency toward violent behavior . Plaintiff testified that he became upset when "around people," and he became nervous and sweaty (Tr. 749).  Third, Plaintiff was prescribed the maximum dosage of Ibuprofen of

800 mg. twice daily to relieve his middle back pain which became more severe when lifting (Tr. 748). Fourth, Plaintiff was prescribed a continuous positive airway pressure (CPAP) machine which he used whenever sleeping (Tr. 750).  Fifth, Plaintiff's visual acuity was decreased, forcing him to wear corrective lenses (Tr. 747-748).

During a typical day, Plaintiff exercised up to 15 minutes and then took his medication, the side effects of which were lethargy and frequent trips to the bathroom.  Plaintiff testified that he slept two to three times daily for several hours each time and that he used his CPAP machine for a majority of the day. Plaintiff did not drive because he was concerned about falling asleep at the wheel (Tr. 750, 756).   In the past, Plaintiff worked at several locations within the Cleveland metropolitan area as a dishwasher.   In that capacity, he lifted from ten to twenty pounds and occasionally assisted the cleaning crew with maintenance.  He used public transportation to go to work (Tr. 752, 753, 754, 755).

**B.     THE VE TESTIMONY**.

The VE reviewed the record and testified that she was an impartial witness who had a duty to advise if her opinion conflicted with the information contained in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a United States Department of Labor publication that organizes jobs in the United States economy based on their similarities and defines the structure and content for performance of all listed occupations (Tr. 756, 757).

The VE opined that Plaintiff had engaged in the same work during eight of the past fifteen years.  The job of kitchen helper described at DOT 318.687-010, is light, unskilled work and has a specific vocational preparation (SVP) , an estimate of the amount of lapsed time a typical worker could learn the techniques, acquire the information and develop the facility for average performance of the listed jobs of two.  In other words, the time required to learn and develop the aptitude for

performing work as a kitchen helper includes anything beyond a short demonstration up to and including one month.

The ALJ posed the *first* hypothetical:

> Consider a hypothetical individual with Plaintiff's age, education and work experience. Further assume that this individual could perform limited range of light work with no ladders, climbing ladders, ropes and scaffolds; occasionally climbing of ramps and stairs; no work at unprotected heights; no work around dangerous machinery; and no commercial driving. This individual is obese and there would be occasional stooping, kneeling, crouching and crawling. This individual could perform simple and more complex tasks in an environment with routine changes in the work routine. This individual would be off task 5% of the time, with occasional contact with the general public and occasional contact with co-workers and supervisors. With these limitations, could the hypothetical individual perform any of Plaintiff's past work?

The VE opined that based on this hypothetical, the individual could perform Plaintiff's past work of dishwashing. In addition, the hypothetical person could perform work as an inspection worker, assembler of small products and packer. These jobs were available in the following numbers:

| POSITION & DOT | STATE OF OHIO | NATION |
|---|---|---|
| Inspection worker<br>DOT 559.687-074 | 2,000 | 500,000 |
| Assembler, small products<br>DOT 706.684-022 | 3,500 | 800,000+ |
| Packer<br>DOT 920.587-018 | 3,000 | 800,000 |

(Tr. 757-759).

The ALJ posed the *second* hypothetical that had the same limitations as the first except that the hypothetical individual would perform sedentary work with a sit/stand option every hour. The VE explained that the hypothetical individual could perform work at the sedentary level such as bench assembler, inspection worker and sorter (Tr. 759). Each of these jobs is classified as unskilled, that is, little or no judgment is needed to do simple duties that can be learned on the job in a short period of time and the time required to learn and develop the aptitude for performing such work includes

anything beyond a short demonstration up to and including one month.  These jobs were available in the following numbers:

| POSITION & DOT | STATE OF OHIO | NATION |
|---|---|---|
| Bench Assembler<br>DOT 754.684-018 | 1,800 | 450,000 |
| Inspection Worker<br>DOT 739.687-182 | 2,000 | 450,000+ |
| Sorter<br>DOT 735.687-030 | 2,000 | 450,000+ |

(Tr. 759-760).

The ALJ posed a *third* hypothetical that required the VE to:

Assume all of the prior limitations and add  the limitation that the person would be off-task 20% of the time, leaving no past work.  Is there other work that the hypothetical individual could do?

The VE responded "No" (Tr. 760).

Plaintiff's counsel posed a *fourth* hypothetical:

Assume the first hypothetical and add the limitation of being off task 20%; would there be work that the hypothetical person could do?

The VE responded "No."

Plaintiff's counsel posed a *fifth* hypothetical:

If I were to add to either the first or second hypothetical, a limitation that this hypothetical individual would miss two to three days every month on a regular and ongoing basis, would that affect your testimony today?

The VE opined that such absences would significantly impact the person's ability to maintain competitive employment (Tr. 760).

## IV.  MEDICAL EVIDENCE.

**A.     ST. VINCENT CHARITY HOSPITAL/ST. LUKES MEDICAL CENTER.**

On June 25, 2001, Plaintiff presented with complaints of edema and sudden shortness of breath

during the night.  The examiner suspected pulmonary congestion; however, he concluded that Plaintiff's

weight precluded diagnostic testing.  Therefore, the dosage of medication used to treat high blood pressure

and heart failure was increased (Tr. 130).

In 2003, Plaintiff underwent the following treatment:

- April 7, the radiological study of Plaintiff's chest showed an enlarged heart (Tr. 167).
- June 3, the radiological study of Plaintiff's chest showed an enlarged heart and borderline pulmonary venous hypertension (Tr. 167-168).
- July 7, Plaintiff was treated for chest pain and bilateral foot and leg swelling.  Digoxin, a medication used to treat heart rhythm problems, was added to his drug therapy (Tr. 127; www.drugs.com).
- August 14, Plaintiff underwent cardiac catheterization and the results showed normal coronary arteries and liver function; however, the plan of preventive care included aggressive risk factor modification (Tr. 162-164).
- September 8, it was considered that Plaintiff would undergo bariatric surgery because he could not breathe when lying down (Tr. 121-122).
- September 22, the pulmonary function test showed no obstructive defect and diffuse mild restrictive lung defect (Tr. 159-160).
- December 8, Plaintiff's glucose levels were elevated and his hemoccult test and complete blood count were abnormal (Tr. 119).
- A split-night study was performed on October 1, during which Plaintiff was undergoing breathing therapy, the electrical activity of the brain and eye movements were measured and a quantitative sound meter of his snores was provided (Tr. 172).  Based on the results, Dr. Reena Mehra, M.D., a pulmonary medicine specialist, diagnosed Plaintiff with severe obstructive sleep apnea (OSA) and suggested that the nocturnal coughing was indicative of asthma (Tr. 172-173).

During 2004, Plaintiff was treated accordingly:

- March 22, the results from the electrocardiogram were normal (Tr. 118-119).
- April 6, the results from the electrocardiogram showed marked sinus arrhythmia.  Plaintiff also had uncontrolled hypertension (Tr. 114-116).
- April 27, Plaintiff presented with complaints of cardiac pain and the cardiac function test could not rule out anterior infarct.
- May 4, results from the routine blood chemistry were negative for abnormality (Tr. 99-104). Plaintiff's triglycerides and cholesterol were lower than the normal range (Tr. 105-112).
- July 12, Plaintiff presented and was treated for numbness in his feet and legs, uncontrolled hypertension and scrotal pain and swelling (Tr. 94-97).
- August 10, Plaintiff's posture, flexibility and strength were within normal limits; his pain was consistent with the Visual Analog Scale and Numeric Pain Scale (Tr. 153-154).  While being evaluated for functional capacity, Plaintiff's blood pressure escalated dangerously high after ambulating 50 feet.  He was advised to go to the emergency room (Tr. 151).

7

- October 8, Plaintiff presented with complaints of dyspnea which was related to uncontrolled hypertension. He participated in the teaching services designed to instruct on how to control hypertension (Tr. 148-150).

During 2005, Plaintiff presented accordingly:

- January 11, Plaintiff sustained a closed head injury which affected his ability to ambulate. The computed tomography study of his head/brain showed no abnormality and the radiological studies of his spine and pelvis showed no abnormality (Tr. 220-222, 227-228).
- April 5, Plaintiff was treated for a sore throat and swelling. His blood pressure was uncontrolled (Tr. 200-202).
- April 12, Plaintiff complained of chest pain. Again, his blood pressure was uncontrolled. The resident found that the pain was likely musculoskeletal (Tr. 199-200).
- May 24, Plaintiff's chest pains were associated with gastroesohageal reflux disease and his hypertension was moderately controlled (Tr. 197-198, 218-219).
- May 27, Plaintiff treated for stomach pain (Tr. 236). After undergoing an upper gastrointestinal endoscopy, he was prescribed Prevacid and given medication to improve bowel function (Tr. 276-277).
- May 28, an X-ray of Plaintiff's abdomen showed a normal gallbladder and biliary tree and probable fatty degeneration of liver (Tr. 190).
- June 14, Plaintiff's medication was increased to control blood pressure. Notably, symptoms related to inflammation of the stomach and esophagus had improved on Prevacid (Tr. 193-195).
- August 9, Plaintiff presented with chest pain. His blood pressure was uncontrolled (Tr. 240-241).
- August 25, the cardiac shadow in the upper part of Plaintiff's chest was slightly enlarged (Tr. 261).
- September 13, Plaintiff was still noncompliant with his medication regimen when he complained of swelling. He was given prescriptions that would last four months (Tr. 246-247).

**B**. **DR. WILFREDO PARAS, M.D., AN INTERNAL MEDICINE SPECIALIST**.

On January 12, 2004, Plaintiff reported that he still suffered with dyspnea and chest pains upon exertion with easy fatigability. However, his chest X-ray on this date was negative for abnormality (Tr. 177). The three films of his chest were negative for heart, mediastinum and pulmonary vessel disease (Tr. 178).

Dr. Paras conducted manual muscle testing and range of motion tests. He opined that Plaintiff could raise his shoulders, elbows, wrists, fingers, hips, knees, feet and great toes against maximal resistance. The range of motion in his shoulder, hips and the range of motion in the shoulders, hips and dorsolumbar spine was less than normal (Tr. 180, 181, 182).

8

## C.     DR. JASON CHAO, M. D., FAMILY PRACTITIONER.

On March 10, 2009, Dr. Chao referred Plaintiff to physical therapy to resolve shoulder strain (Tr. 600).  Dr. Chao reported that the results from the comprehensive metabolic panel based upon a specimen collected on March 23, 2009, showed a level of alkaline phosphatase that significantly exceeded the levels found in healthy individuals and a complete blood count that was lower than the levels found in healthy individuals (Tr. 630, 637, 639).  On April 14, 2009, Dr. Chao diagnosed Plaintiff with dermatitis (Tr. 601). On May 19, 2009, Dr. Chao refilled all of Plaintiff's prescriptions and referred him to nutrition therapy (Tr. 602).  On October 6, 2009, Dr. Chao refilled prescriptions and addressed Plaintiff's complaints of neck and stomach problems (Tr. 604).

During the course of treatment in 2009 and 2010, Plaintiff experienced undesirable weight gain and Dr. Chao recommended a specifically tailored diet developed and monitored  by a registered dietician (RD).  The RD assisted Plaintiff in maintaining his desirable weight by administering a diet regimen designed to reduce the risk of developing complications in pre-existing conditions such as diabetes as well as ameliorate the effects of any existing conditions such as hypertension.  The crux of the therapy included the consistent emphasis that Plaintiff should consume small meals with lean protein and drink plenty of water.  The RD persisted even though Plaintiff resisted making the recommended lifestyle changes (Tr. 509-513, 517, 603, 607, 609, 610, 613).

On January 7, 2010, Dr. Chao treated Plaintiff for chronic diarrhea, suspecting that it was the result of gastric dumping. He also addressed Plaintiff's uncontrolled hypertension (Tr. 605).  On March 16, 2010, he ordered routine chemistry testsf which showed red blood count, hemoglobin and hematocrit levels that were lower than the levels in healthy individuals (Tr. 630-635).  Dr. Chao related Plaintiff's dermatitis to

9

physical stimulus on May 11, 2010 (Tr. 606) and he ordered routine blood chemistry tests on July 28, 2010 (Tr. 608).

Dr. Chao referred Plaintiff to Dr. Karen R. Horowitz, an endocrinologist familiar with post-gastric bypass surgery disorders.  She evaluated Plaintiff on June 14, 2010 and conducted a follow-up visit on July 16, 2010.  Dr. Horowitz suspected that Plaintiff had gastric dumping syndrome that was the result of inappropriate eating so in addition to instructing Plaintiff on home glucose management, she recommended nutrition education (Tr. 575-584).

On January 3, 2011, Dr. Chao prescribed Tylenol #3 for Plaintiff's sprained wrist (there was no radiographic evidence of acute fracture or dislocation) (Tr. 615), and he prescribed more Tylenol #3 on January 19, 2011, to treat persistent wrist pain (Tr. 616).  On March 23, 2011, Dr. Chao addressed bilateral leg swelling issues (Tr. 516, 522-525).  Dr. Chao conducted a physical examination on August 2, 2011, and determined that Plaintiff was suffering from insomnia, constipation and inadequately controlled hypertension (Tr. 518-519).  Dr. Chao admitted Plaintiff into the hospital on August 14, 2011, to address Plaintiff's complaint of chest pains and seizures.  Plaintiff underwent diagnostic tests and a neurological consultation, the results of which showed:

- •    No radiographic evidence of acute cardiopulmonary process.
- •    OSA.
- •    Low red blood count.
- •    Low hemoglobin and hematocrit.
- •    Low mean corpuscular hemoglobin concentration.

(Tr. 681-696, 698).

Dr. Chao ordered a complete polysomography which was conducted on August 18, 2011.  The results showed mild Obstructive Sleep Apnea ( OSA) (Tr. 695).  On September 6, 2011, Dr. Chao refilled the prescription for medication to treat breathing problems (Tr. 520).  Dr. Chao completed a statement of

physical capacity on September 8, 2011 and determined that Plaintiff:

- Can lift and/or carry 10 pounds.
- Can stand/walk for 10 minutes without interruption for a total of eight hours.
- Can sit for a total of eight hours, one hour without interruption.
- Can rarely climb, stoop, crouch, kneel and crawl.
- Cannot be exposed to temperature extremes, chemicals, dust, noise and fumes.
- Must have a sit/stand option
- Is limited to working eight hours a day, five days per week because of his obesity and low back pain (Tr. 496-497).

On October 18, 2011, Dr. Chao noted that Plaintiff's weight loss had resulted in better controlled hypertension. He refilled the prescription for Ibuprofen (Tr. 662).

On March 14, 2012 and July 24, 2012, Dr. Chao refilled prescriptions and ordered routine chemistry, hematology, serology and endocrinology tests to ascertain the etiology of Plaintiff's back pain and seizures. Notably the results from this group of tests showed red blood count, hemoglobin and hematocrit levels that were lower than the reference intervals used to describe the variations of a measurement in healthy individuals (Tr. 664-669, 671-677, 697, 699, 715-722).

## D.   DR. JOHN R. FISHER, M.D., A SPECIALIST IN PSYCHIATRY.

While treating with Dr. Chao for his physical health, from August 27, 2009 through May 14, 2012, Plaintiff treated with Dr. Fisher for depression. Initially, Dr. Fisher monitored Plaintiff's use of Wellbutrin to control the symptoms (Tr. 433A-434A, 434). During the course of treatment, Dr. Fisher noted an inverse correlation between Plaintiff's depression and exposure to people. When alone, Plaintiff was calmer, less tense and nonviolent. Risperdal® was added to his drug therapy on February 4, 2011 and the dosage was gradually increased resulting in a better attitude and fewer symptoms of depression (Tr. 643-647, 652-659, 679, 701-713, 723-726).

On August 8, 2011 and December 2, 2011, Dr. Fisher opined that Plaintiff could function independently without special supervision, that he could maintain his appearance, he could leave home on

his own and he could manage his funds and schedules.  Dr. Fisher opined that Plaintiff's intellectual functioning, ability to make occupational adjustments, and ability to make personal and social adjustments were significantly limited (Tr. 649-650).

E.    HEART AND VASCULAR TESTS AND TREATMENTS.

On December 29, 2009, the radiographic evidence of Plaintiff's heart showed a silhouette that was significantly enlarged with mildly prominent pulmonary vasculature (Tr. 618).  The stress test administered on December 30, 2009, showed a normal sinus rhythm but a slowed heartbeat (Tr. 621-622, 624-626).  The nuclear medicine procedure which illustrated the function of the heart muscle showed normal results (Tr. 623).  The electrocardiogram administered on October 11, 2010, confirmed a slow heartbeat (Tr. 619) while the same test administered on January 19, 2011, showed  anterolateral infarct, possibly acute (Tr. 620).

F.    UNIVERSITY HOSPITAL.

In 2007, Plaintiff treated for chest pain on January 30 and May 6 (Tr. 399, 397).  Plaintiff treated for sharp chest pains on November 24 (Tr. 395-396).  In the meantime, he underwent a radiological study of the cervical spine on April 6, which was limited by his body size, but showed no evidence of fracture or altered state of the vertebra (Tr. 410).  On April 6, 2007 and prior to surgery, a medical device used to filter the inferior vena cava was inserted.  On April 18, Plaintiff underwent gastric bypass surgery (Tr. 419-420, 421-422).  On May 6, Plaintiff's wound was treated for possible infection (Tr. 397-398).

On January 10, 2008, Plaintiff underwent a transthoracic echocardiogram, the results of which showed abnormality in the following areas:

- •    Moderate concentric ventricular hypertrophy on the left.
- •    Left atrium mild to moderately dilated.
- •    Mild mitral valve regurgitation.
- •    Trace pulmonic regurgitation.

12

- Mild pulmonary hypertension.

(Tr. 404-406).

On January 11, 2008, Plaintiff underwent an endoscopy and cardiac catheterization.  The results from the endoscopy were normal (Tr. 417-418).  The results from the catheterization showed no significant coronary stenosis by angiography but there was right dominance with tortuous coronaries (Tr. 402-403). On the following day, Plaintiff was treated for dehydration (Tr. 393-394).

On March 18, 2008, Plaintiff underwent repair of an incisional hernia (Tr. 415-416).  The test to rule out acute deep vein thrombosis was administered on March 19, 2008 (Tr. 401).  On March 24, 2008, Plaintiff underwent repair of the abdominal hernia (Tr. 413-414).

The imaging studies of Plaintiff's abdomen taken on April 21, 2008, showed interval improvement in the midline anterior abdominal wall fluid collection and rounded hyperdensities in the subcutaneous tissues of the inter-abdominal wall (Tr. 407).

Plaintiff underwent  surgery to remove excess skin from his stomach on October 9, 2008 (Tr. 411-412) and on October 14, 2008, he was treated for anemia resulting from postoperative bleeding (Tr. 387).

On December 29, 2009, Plaintiff complained of persistent diarrhea, heart palpitations, red eye and insomnia.  The diagnostic evidence did not show any heart abnormality (Tr. 490-494)

On May 12, 2010, the chronic diarrhea was linked to Plaintiff's diet after the results from his colonoscopy were normal (Tr. 486-489).  On June 14, 2010, Dr. Horowitz diagnosed Plaintiff with type II diabetes, conducted patient education and ordered home glucose monitoring twice daily (Tr. 578-584). On September 3, 2010, Plaintiff treated for a laceration to his thumb and while undergoing treatment, he experienced some chest discomfort which the examining physician related to infusion made to test the gallbladder ejection fraction (Tr. 481-484).  On October 19, 2010, Plaintiff underwent a cholecystectomy

(Tr. 478-480).

Dr. Mohamad Azmi Marouf, M.D., an emergency medicine specialist, determined on March 12, 2011, that Plaintiff had pedal edema and stasis dermatitis (Tr. 531-532).  On May 25, 2011, Plaintiff presented to the Department of Surgery with grave concerns about his weight gain and lightheadedness.  Dr. Leena Khaitan, M.D., suggested that Plaintiff's lightheadedness was related to his heavy carbohydrate intake and that his intake of carbohydrates was contributing to the weight gain (Tr. 533).

Plaintiff complained of bilateral shoulder pain on July 30, 2012.  Although the radiographic examination was normal, Plaintiff was diagnosed with inflammation of the tendons.  A steroid-like injection was administered (Tr. 736-737).

At the Rehabilitation and Sports Medicine Department, Plaintiff was examined for outpatient physical therapy on August 1, 2012.  The examination was limited by Plaintiff's excessive complaints of pain (Tr. 728-734).

## G.    NON-EXAMINING CONSULTANTS.

### 1.    CONSULTATIVE EXAMINATION, MANUAL MUSCLE AND RANGE OF MOTION TESTS.

Dr. Franklin D. Krause, M.D., an internist, conducted a pulmonary function test on March 25, 2004, the results of which showed a deficit (Tr. 183-188).

On March 2, 2010, Dr. Krause conducted a consultative examination, range of motion and manual muscle testing.  He attributed Plaintiff's complications, in part, to his bariatric surgery, and also suggested that Plaintiff had arteriosclerotic heart disease with normal sinus rhythm, status post myocardial infarction with unremarkable angiography in January 2008, without ongoing congestive heart failure, status post pulmonary embolism and uncomplicated type II diabetes (Tr. 437-438).  Dr. Krause concluded that Plaintiff could not move his cervical spine and shoulders through its normal range of motion but he could

14

move his dorsolumbar spine, elbows, wrists, hands, fingers, hips, knees and elbows through their normal range of motion (Tr. 440, 441-442).  The results from the manual muscle tests showed that Plaintiff could raise his shoulders, elbows, wrists, fingers, hips, knees and feet against maximal resistance (Tr. 439).

    2.    **PSYCHOLOGICAL REPORT**

Dr. Herschel Pickholtz conducted a clinical interview and mental status evaluation on June 28, 2010.  When describing his work-related mental capabilities, Dr. Pickholtz opined that:

a.    Plaintiff's ability to understand, remember and follow instructions based upon overall responding, presentation and description of daily activities, places him in the mild range of impairment.

b.    Plaintiff's ability to maintain attention and to perform simple repetitive tasks based upon pace and persistence during the evaluation fall within the mild range of impairment.

c.    Plaintiff's overall ability to relate to others including fellow workers and supervisors seems to fall within the moderate range of impairment.

d.    Plaintiff's ability to withstand the stresses and pressures associated with day-to-day work activities, from a psychological perspective, falls within the moderate range of impairment  (Tr. 456).

Based on the procedures in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, a standard classification of mental disorders used by mental health professions in the United States, Dr. Pickholtz made the following correlations between Plaintiff's mental health and the criteria:

Axis I is the top-level diagnosis that usually represents the acute symptoms that need treatment. Dr. Pickholtz determined that Plaintiff had a bipolar I affective disorder most recent episode mixed without psychotic features, moderate, in partial remission.

Axis II is an assessment of personality disorders and intellectual disabilities, usually life-long problems that first arise in childhood.  Dr. Pickholtz determined that Plaintiff had a learning disorder, not otherwise specified.

Axis III is for medical or neurological conditions that may influence a psychiatric problem.  Dr. Pickholtz concluded that Plaintiff had some major physical complaints related to ongoing seizures and obesity.

Axis IV identifies recent psycho-social stressors - a death of a loved one, divorce, losing a job, etc. - that may affect the diagnosis, treatment, and prognosis of mental disorders.  Dr. Pickholtz determined that Plaintiff had physical, occupational and economic problems compounded by a learning disability and residual bipolar issues.

Axis V identifies the patient's level of function on a scale of 0-100, (100 is top-level functioning).

15

Known as the Global Assessment of Functioning (GAF) Scale, the Scale subjectively quantifies a patient's ability to function in daily life. Dr. Pickholtz determined that Plaintiff's overall ability to function was limited by moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers). Dr.Pickholtz assigned Plaintiff a GAF of 55 (Tr. 456-457; https://www.msu.edu/course/sw/840).

**3.   PSYCHIATRIC REVIEW TECHNIQUE.**

On July 6, 2010, Dr. Patricia Semmelman, Ph.D., considered the medical evidence and concluded

that Plaintiff had a bipolar disorder and the degree of resulting functional limitations was as follows:

| | | |
|---|---|---|
| a. | Restriction of activities of daily living | Mild |
| b. | Difficulties maintaining social functioning | Moderate |
| c. | Difficulties in maintaining concentration, persistence or pace | None |
| d. | Episodes of decompensation | None |

(Tr. 461, 468).

**4.   MENTAL RESIDUAL FUNCTIONAL CAPACITY (RFC) ASSESSMENT.**

Dr. Semmelman made the following summary conclusions:

a.   Plaintiff had no significant limitations in his ability to understand and remember.

b.   With the exception of moderate limitations in the ability to complete a normal workweek without interruptions from psychologically based symptoms, Plaintiff had no significant limitations in his ability to sustain concentration and persistence.

c.   Plaintiff specifically had moderate limitations in the ability to interact appropriately with the general public, accept  instructions and respond appropriately to criticism and get alone with co-workers and peers.  Otherwise, he had no significant limitations with respect to social interaction.

d.   With the exception of the moderate limitation in the ability to respond appropriately to changes in the work setting, Plaintiff had no significant limitations in the ability to adapt.
(Tr. 472-473)

.

**5.   PHYSICAL RFC ASSESSMENTS.**

1.   On March 6, 2009, Dr. William Bolz, M.D., considered the evidence and concluded  that

Plaintiff could/must:

a.   Occasionally lift and/or carry 20 pounds.

16

b.        Frequently lift and/or carry 10 pounds.
c.        Stand and/or walk about six hours in an 8-hour workday.
d.        Sit (with normal breaks) about six hours in an 8-hour workday.
e.        Engage in unlimited pushing and pulling, other than as shown for lift and/or carry.
e.        Frequently climb using a ramp or stairs and occasionally climbing use a ladder, rope or scaffold.
f.        Occasionally stoop and crouch.

(Tr. 424-432).

2.        On April 21, 2010, Dr. Leslie Green, M.D., considered the evidence and concluded that

Plaintiff could/must:

a.        Occasionally and frequently lift and/or carry 10 pounds.
b.        Stand and/or walk about six hours in an 8-hour workday.
c.        Sit (with normal breaks) about six hours in an 8-hour workday.
d.        Engage in unlimited pushing and pulling, other than as shown for lift and/or carry.
e.        Never climb using ladders, ropes or scaffolds.
f.        Avoid all exposure to hazards, machinery and heights.

(Tr. 443-450).

### V. CONTINUING DISABILITY STANDARD OF REVIEW.

There is no presumption of continuing disability. *Compton v. Commissioner of Social Security*, 2014 WL 315525, *9 (N.D.Ohio,2014) (*citing Kennedy*, 247 F. App'x at 764) (*citing Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286–287 n. 1 (6th Cir.1994)).  When a recipient of disability benefits challenges the cessation of benefits, the central issue is whether the recipient's medical impairments have improved to the point where he or she is able to perform substantial gainful activity. *Id.* at *7 (*citing* 42 U.S.C. § 423(f)(1); *Kennedy v. Astrue*, 247 F.App'x 761, 764 (6th Cir.2007)).  Whether an individual's entitlement to benefits continues, depends on whether "there has been any medical improvement in [the individual's] impairment(s) and, if so, whether this medical improvement is related to [the individual's] ability to work." *Id.* (*citing* 20 C.F.R. §§ 404.1594(b), 416.994(b)).

The cessation evaluation process is a two-part process. *Id.* (*See Kennedy*, 247 F.App'x at 764–65).

17

The first part of the process focuses on medical improvement.  *Id.* (*citing Kennedy*, 247 F.App'x at 764).

The second part of the cessation analysis focuses on whether the individual has the ability to engage in

substantial gainful activity.  *Id.* (*citing Kennedy*, 247 F.App'x at 765).  A claimant seeking to prevent the

termination of disability benefits bears the burden of showing by medical evidence that he or she is

disabled.  42 U.S.C. § 423(f)(1)(A) (Thomson Reuters 2014).  The ultimate burden of proof lies with the

Commissioner in termination proceedings." *Id.* (*citing* 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego v.*

*Sullivan*, 940 F.2d 942, 944 (5th Cir.1991)).

        When deciding whether a recipient's entitlement to disability benefits has ended, the Commissioner

uses an eight-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1594(f) (1)-(8) and

416.994(f)(1)-(8), to determine whether the claimant's disability has ended and if he or she is now able to

work.  *Id.* (*citing Kennedy*, 247 F. App'x at 764).  The steps are:

1.  Do you have an impairment or combination of impairments which meets or equals the severity of
    an impairment listed in appendix 1 of subpart P of part 404 of this chapter?  If you do, your
    disability will be found to continue.  *Id.* at *8.

2.  If you do not, has there been medical improvement as defined in paragraph (b)(1)(I) of this section?
    If there has been medical improvement as shown by a decrease in medical severity, see step 3 in
    paragraph (b)(5)(iii) of this section.  If there has been no decrease in medical severity, there has
    been no medical improvement. ( See step 4 in paragraph (b)(5)(iv) of this section.)  *Id.*

3.  If there has been medical improvement, we must determine whether it is related to your ability to
    do work in accordance with paragraphs (b)(1)(I) through (b)(1)(iv) of this section; i.e., whether or
    not there has been an increase in the residual functional capacity based on the impairment(s) that
    was present at the time of the most recent favorable medical determination.   If medical
    improvement is not related to your ability to do work, see step 4 in paragraph (b)(5)(iv) of this
    section.  If medical improvement is related to your ability to do work, see step 5 in paragraph (b)(5)
    (v) of this section.  *Id.*

4.  If we found at step 2 in paragraph (b)(5)(ii) of this section that there has been no medical
    improvement or if we found at step 3 in paragraph (b)(5)(iii) of this section that the medical
    improvement is not related to your ability to work, we consider whether any of the exceptions in
    paragraphs (b)(3) and (b)(4) of this section apply.  If none of them apply, your disability will be
    found to continue. If one of the first group of exceptions to medical improvement applies, see step

18

5 in paragraph (b)(5)(v) of this section. If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process. *Id.*

5.  If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 416.921). This determination will consider all your current impairments and the impact of the combination of these impairments on your ability to function. If the residual functional capacity assessment in step 3 in paragraph (b)(5)(iii) of this section shows significant limitation of your ability to do basic work activities, see step 6 in paragraph (b)(5)(vi) of this section. When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled. *Id.*

6.  If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 416.960. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended. *Id.*

7.  If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (b)(5)(vi) of this section and your age, education, and past work experience (see paragraph (b)(5) (viii) of this section for an exception to this rule). If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues. *Id.* at *9.

8.  We may proceed to the final step, described in paragraph (b) (5)(vii) of this section, if the evidence in your file about your past relevant work is not sufficient for us to make a finding under paragraph (b)(5)(vi) of this section about whether you can perform your past relevant work. If we find that you can adjust to other work based solely on your age, education, and residual functional capacity, we will find that you are no longer disabled, and we will not make a finding about whether you can do your past relevant work under paragraph (b)(5)(vi) of this section. If we find that you may be unable to adjust to other work or if § 416.962 may apply, we will assess your claim under paragraph (b)(5)(vi) of this section and make a finding about whether you can perform your past relevant work. *Id.*

## VI. SUMMARY OF THE ALJ'S DECISION.

Upon careful consideration of the entire record, ALJ Rhoa made the following FINDINGS OF FACT

AND CONCLUSIONS OF LAW:

1.  The most recent favorable medical decision finding that Plaintiff was disabled is the above-mentioned ALJ decision dated November 14, 2005. This is known as the comparison point

decision (CPD).

2.    Following a continuing disability review, the Social Security Administration determined on March 25, 2009, that Plaintiff's disability had ceased by March 1, 2009.  Plaintiff has not engaged in any disqualifying substantial gainful activity since the disputed March 1, 2009, disability cessation date.

3.    Since the disputed March 1, 2009, disability cessation date, Plaintiff has not had an impairment or combination of impairments, that has met or medically equaled the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.    Medical improvement had occurred by the disputed March 1, 2009 disability cessation date.

5.    The medical improvement that had occurred by the disputed March 1, 2009 disability cessation date is related to Plaintiff's ability to work because it resulted in an increase in his residual functional capacity.

6.    The medically determinable impairments Plaintiff has since March 1, 2009, that is obesity, depression and diabetes mellitus, are considered severe impairments because in combination and/or individually, they have significantly limited Plaintiff's ability to perform basic work functions.

7.    Since March 1, 2009, Plaintiff has retained the residual functional capacity that has not allowed him to perform past relevant work as a dishwasher; however, since March 1, 2009, Plaintiff has retained the residual functional capacity to perform all the basic work activities described in 20 C.F.R. §§ 404.1521, 404.1545, with the exception of briefer periods of less than 12 continuous months, Plaintiff retained the residual functional capacity to perform all of the basic activities described within the following parameters:

- He can lift, carry, push or pull up to 10 pounds frequently and up to 20 pounds occasionally.
- He can sit with normal breaks for about 6 hours in an eight-hour period.
- He can stand/walk with normal breaks for about 6 hours in an eight-hour period.
- He has also been able to stoop, kneel, crawl, crouch and climb stairs on an occasional basis and/or ramps.
- He can perform simple and more complex tasks in environments where he would only have routine changes in his duties/work routine.
- He is able to have occasional contact with co-workers, supervisors and the general public
- He would be expected to be off task 5% of a normal workday/workweek, notwithstanding the above described residual functional capacity.

8.    Upon careful consideration of the entire record, the ALJ found that from June 1, 2008 through December 31, 2008, Plaintiff had the residual functional capacity to perform sedentary work except that he must be able to switch between sitting and standing every hour, he can never climb ladders, ropes, scaffolds, and can occasionally climb ramps and stairs, he must avoid hazards such as unprotected heights and dangerous machinery, he must have an additional and unscheduled break

of 5-10 minutes per day and he would be off task 10% of the time.

9.    Since the disputed March 1, 2009 disability cessation date, Plaintiff has been able to perform other work that exists in significant numbers in the economy considering his residual functional capacity, age, education and past work experience.

10.   In light of Finding 9, ALJ Rhoa concludes that Plaintiff's disability ended by the disputed March 1, 2009 disability cessation date (Tr. 18-32).

## VII. STANDARD OF REVIEW.

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (1994). Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Id*. (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id*. (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole. *Id.* (*citing Kirk*, 667 F.2d at 536). If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

### VIII. THE POSITION OF THE PARTIES.

Plaintiff's three primary arguments are:

A.    There is no evidence of medical improvement and therefore the continuing or ceasing disability analysis was inappropriate.

B.    The ALJ failed to give controlling weight to the opinions of Drs. Chao and Fisher, thereby violating the treating physician rule.

C.    The hypothetical is incomplete and fails to adequately account for his limitations.

Defendant responds that:

A.    The ALJ reasonably concluded that Plaintiff's disability ended March 1, 2009 as a result of medical improvement.

B.    Substantial evidence supports the ALJ's determination that plaintiff's impairments had medically improved as of March 1, 2009.

C.    Substantial evidence supports the weight the ALJ afforded to the medical opinions of record.

D.    The ALJ's hypothetical question incorporated all of Plaintiff's physical and mental limitations supported by the record.

### IX. ANALYSIS

#### A.    IS THERE SUFFICIENT EVIDENCE OF MEDICAL IMPROVEMENT?

Plaintiff contends that the ALJ erred in finding that the following conditions showed medical improvement:

a.    Cardiomyopathy.
b.    Hypertension.
c.    Obesity.
d.    OSA.

#### 1.    THE LAW

The implementing regulations define "medical improvement" as "any decrease in the medical severity of [the individual's] impairment(s) which was present at the time of the most recent favorable medical decision that [the individual was] disabled or continued to be disabled." *Compton, supra*, 2014 WL 315525, at *9 (*citing* 20 C.F.R. § 404.1594(b)(1)). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory

22

findings associated with [the individual's] impairment(s) . . .  *Id.* (*citing* 20 C.F.R. §§ 404.1594(b)(1)(I),

416.994(b) (1)(I)).  If there has been a decrease in the severity of the impairments since the favorable

decision, the medical improvement is related to the individual's ability to work only if there has been a

corresponding 'increase in [the claimant's] functional capacity to do basic work activities . . . ' " *Id.* (*citing*

*Kennedy*, 247 F.App'x at 765) (*quoting* 20 C.F.R. § 404.1594(b)(3)); *see also Nierzwick v. Commissioner*

*of Social Security*, 7 F.App'x 358, 361 (6th Cir.2001)).

The law provides for certain limited situations when your disability can be found to have ended

even though medical improvement has not occurred, if you can engage in substantial gainful activity.

These exceptions to medical improvement are intended to provide a way of finding that a person is no

longer disabled in those limited situations where, even though there has been no decrease in severity of the

impairment(s), evidence shows that the person should no longer be  considered disabled or never should

have been considered disabled.  If one of these exceptions applies, we must also show that, taking all your

current impairment(s) into account, not just those that existed at the time of our most recent favorable

medical decision, you are now able to engage in substantial gainful activity before your disability can be

found to have ended.  As part of the review process, you will be asked about any medical or vocational

therapy you received or are receiving.  Your answers and the evidence gathered as a result as well as all

other evidence, will serve as the basis for the finding that an exception applies.

1.   Substantial  evidence  shows  that  you  are  the  beneficiary  of  advances  in  medical  or
     vocational therapy or technology (related to your ability to work).

2.   Substantial evidence shows that you have undergone vocational therapy (related to your
     ability to work).

3.   Substantial  evidence  shows  that  based  on  new  or  improved  diagnostic  or  evaluative
     techniques your impairment(s) is not as disabling as it was considered to be at the time of
     the most recent favorable decision.

4.      Substantial evidence demonstrates that any prior disability decision was in error.

5.      You are currently engaging in substantial gainful activity.

20 C.F.R. § 404.1594 (d) (1)-(5) (Thomson Reuters 2014).

**2.      THE DISPOSITION**.

**a      CARDIOMYOPATHY**.

Plaintiff claimed that he was unable to work, in part, because he experienced two heart attacks.  The ALJ compared Plaintiff's baseline status primarily to the stress test results from 2009 and complaints of chest discomfort arising during the preoperative evaluation for removal of his gallbladder.  Otherwise, there were no indications suggesting heart failure, heart blockage or diagnostic abnormality.  Rather, the signs and/or laboratory findings showed that Plaintiff was generally asymptomatic.  Having failed to introduce medical evidence that showed his heart condition remained essentially the same as it was at the time of the earlier favorable determination or that it worsened during the period in which he received benefits, the ALJ could reasonably assume that Plaintiff's heart condition underwent medical improvement.

Substantial evidence supports the ALJ's finding that Plaintiff's medical improvement had a disparate impact on his claimed inability to work and a minimal effect on his residual functional capacity findings (Tr. 24, 29).  Plaintiff identified no medical evidence which conclusively shows traumatic residual effects of his heart attack.  To the contrary, the record indicates after treatment, the swelling, pain and episodes of shortness of breathe dissipated and Plaintiff only sought treatment for continued heart maintenance.  Accordingly, the ALJ determined that Plaintiff retained the residual functional capacity to perform a limited range of light work.  In light of the limitations found by the ALJ, the VE testified that there are unskilled positions at the light and sedentary levels that Plaintiff could perform.  The VE testified that these jobs existed in significant numbers in the national and regional economies.  The ALJ reasonably

24

relied on the VE, and the ALJ's conclusion that Plaintiff could perform substantial gainful activity is supported by substantial evidence.

As noted above, this Magistrate's task in reviewing a Social Security disability determination is a limited one. The ALJ's findings are conclusive if they are supported by substantial evidence, according to 42 U.S.C. § 405(g). For these reasons, the Magistrate rejects Plaintiff's arguments that the ALJ erred in finding that Plaintiff's impairment–cardiomyopathy–showed medical improvement and Plaintiff's ability to work was significantly affected by his heart condition.

**b.    HYPERTENSION.**

Prior to the bariatric surgery, Plaintiff had hypertension with a history of noncompliance with the medication therapy. The ALJ aptly points out that after March 1, 2009, there was medical improvement to the degree that Plaintiff's hypertension was not of the severity to meet or equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. On October 18, 2011, Dr. Chao noted that Plaintiff's weight loss had resulted in "better controlled" hypertension. This statement by Dr. Chao presumes that there have been changes in the symptoms and signs associated with this impairment; that the symptoms and signs, if any, were transitory and that the symptoms and signs were capable of being controlled with the regimen of medication and weight loss.

After a finding of medical improvement, the ALJ proceeded to a comparison of a residual functional capacity assessed on the basis of the current severity of those impairments which were present at the point of the last favorable decision and the residual functional capacity at the time of the CPD. There were clearly no expert medical opinions or subjective complaints that Plaintiff was precluded from engaging in physical or mental duties as a result of the effects of hypertension. Any increase in Plaintiff's current residual functional capacity was not based on changes in the signs, symptoms, or laboratory findings of

25

Plaintiff's hypertension, thus, any medical improvement in his hypertension that occurred was not considered to be related to his ability to work.

The Magistrate rejects Plaintiff's argument that the ALJ erred in finding that Plaintiff's impairment–hypertension– showed  medical improvement or that Plaintiff's ability to work was not significantly affected by his hypertension.

### C.    OBESITY.

Plaintiff contends that the ALJ's finding that his morbid obesity was medically improved is not supported by substantial evidence.

The Agency has set forth its policy for evaluating continuing disability in cases involving obesity. In TITLES II AND XVI: EVALUATION OF OBESITY, Social Security Ruling (SSR) 02-1p, 2000 WL 628049, *8 (September 12, 2002), the Administration provides guidance concerning the evaluation of obesity claims. Specifically, the Ruling addresses the amount of weight loss that represents medical improvement:

> Because an individual's weight may fluctuate over time and minor weight changes are of little significance to an individual's ability to function, it is not appropriate to conclude that an individual with obesity has medically improved because of a minor weight loss.  A loss of less than 10 percent of initial body weight is too minor to result in a finding that there has been medical improvement in the obesity.  However, we will consider that obesity has medically improved if an individual maintains a consistent loss of at least 10 percent of body weight for at least 12 months.  We will not count minor, short-term changes in weight when we decide whether an individual has maintained the loss consistently.

> If there is a coexisting or related condition(s) and the obesity has not improved, we will still consider whether the coexisting or related condition(s) has medically improved.

> If we find that there has been medical improvement in obesity or in any coexisting or related condition(s), we must also decide whether the medical improvement is related to the ability to work.  If necessary, we will also decide whether any exceptions to the medical improvement review standard apply and, if appropriate, whether the individual is currently disabled.

At various parts of the record, Plaintiff's weight was reported to be between 600 and 850 pounds

26

(Tr. 283, 433A, 437, 529).  After the bariatric surgery, Plaintiff lost considerable weight and between October 2010 and 2012, his weight vacillated from 335 pounds to 410 pounds (Tr. 437, 453, 504, 505, 511, 513, 656, 658, 711, 713).  The record confirms that Plaintiff's weight loss was greater than 10% and that he maintained that weight loss for at least 12 continuous months.  Under the regulations cited above, Plaintiff experienced a decrease in the medical severity of obesity and passed the "medical improvement" test.

The ALJ discussed medical conditions that could be impacted by Plaintiff's obesity and determined that the severity of this impairment no longer met or equaled the same listing section used initially to make the favorable decision.  Thus, the ALJ concluded that Plaintiff's medical improvement was related to his ability to work.  Acknowledging that the combined effects of obesity with other impairments may be greater than might be expected with obesity alone, the ALJ compared the residual functional capacity based on the current severity with the residual functional capacity before the putative medical improvements.  The ALJ correctly found that Plaintiff's obesity showed medical improvement related to the ability to do work and that finding was based on objective medical evidence.  Sufficient medical evidence supported a finding that Plaintiff's chronic obesity resulted in breathing, sitting, lifting and standing difficulties.  The medical evidence also showed Plaintiff suffered from swelling and abnormal range of motion.  The new evidence showed that Plaintiff could sit, stand and walk for about 6 hours in an 8-hour workday and that he could stand/walk with normal breaks, 6 hours in an 8-hour workday.  Plaintiff could also occasionally climb, stoop, kneel, crouch and crawl.

The ALJ determined that although Plaintiff's limitations prevented him from returning to his previous occupation, Plaintiff's medical improvement as well as his residual functional capacity enabled him to perform other compatible jobs existing in substantial amounts in the economy.  The ALJ stated that

27

although Plaintiff's limitations did not allow him to perform a full range of light work, there were a significant amount of jobs in the national economy that he could perform.  As such available jobs, the VE stated that examples of routine repetitive simple work activities that he could perform would accommodate his residual functional capacity.  The VE also stated that the aforementioned jobs were routine repetitive simple jobs which could be learned  after a brief explanation and up to thirty days.  They were classified in terms of dexterity as unskilled and in terms of demand as light.  Therefore, the ALJ concluded that when taking into consideration Plaintiff's age, educational background, work experience and residual functional capacity, Plaintiff was capable of making a successful adjustment to work, especially when there are a significant number of jobs in the national economy that he could perform.  Although the ALJ found that the Plaintiff could not perform any of his past jobs (dishwasher), taking into consideration his age, education and  medical conditions, Plaintiff was found to have the residual functional capacity to perform a significant range of light work.

The ALJ's decision that Plaintiff's obesity showed medical improvement as related to his ability to work is supported by substantial evidence.  The Magistrate may not re-weigh the evidence or substitute her judgment for that of the Commissioner when the analysis has been comprehensive and thorough as in the instant case (Tr. 24-29).

### d.    OBSTRUCTIVE SLEEP APNEA (OSA).

Plaintiff's OSA was considered severe in October 2003 (Tr. 173).  On August 18, 2011, Plaintiff underwent a second sleep study and the results showed "mild" OSA (Tr. 694-695).  No further study was performed.  Plaintiff has failed to articulate how a decrease in the signs and symptoms demonstrates that there was no medical improvement and otherwise precludes him from engaging in physical or mental duties.  Any increase in Plaintiff's current residual functional capacity was not based on changes in the

signs, symptoms, or laboratory findings of Plaintiff's OSA, thus, any medical improvement in his OSA that occurred was not considered to be related to his ability to work.

**B.     MEDICAL EXPERTS**.

Plaintiff concludes that the ALJ's analysis of his continuing disability claim is flawed in several respects, the primary error being that the ALJ failed to adequately assess the opinions of his treating psychiatrist and physician.

**1.     TREATING PHYSICIAN STANDARDS**

An ALJ is bound to adhere to certain governing standards when assessing the medical evidence in support of a disability claim. *Gentry v. Commissioner of Social Security*, 741 F.3d 708, 723 (6th Cir. 2014) (*citing Wilson v. Commissioner of Social Security,* 378 F.3d 541, 545 (6th Cir.2004)).  Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513).  The second is known as the "treating physician rule," *Id.* (*see Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir. 2007), requiring the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (language moved to 20 C.F.R. § 404.1527(c)(2) on March 26, 2012)).  The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective "cannot be obtained from objective medical findings alone."  *Id.* (*citing* 20 C.F.R. § 416.927(d)(2) (language moved to 20 C.F.R. § 416.927(c)(2) on March 26, 2012)).  Even when not controlling, however, the ALJ must consider certain factors, including

29

the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors.  *Id.* (*citing Rogers, supra,* 486 F.3d at 242).  In all cases, the treating physician's opinion is entitled to great deference even if not controlling.  *Id.*  The failure to comply with the agency's rules warrants a remand unless it is harmless error.  *Id.* (*see Wilson*, *supra,* 378 F.3d at 545–46).

      a.     DR. CHAO.

The ALJ acknowledges that Dr. Chao is a treating physician and makes cursory references to his treatment of Plaintiff's cardiomyopathy, hypertension and sleep apnea (Tr. 24, 25).  However, the ALJ bypasses the controlling weight analysis and merely states that he gives Dr. Chao's physical residual functional capacity assessment "lessor weight" (Tr. 29).

The Sixth Circuit has identified certain breaches of the treating physician rules as grounds for reversal and remand, specifically, the failure to explain how the opinion of a source properly considered as a treating source is weighed.  *Ammons v. Commissioner of Social Security*, 936 F.Supp.2d 860, 866 (N.D.Ohio,2013) (*citing Blakely v. Commissioner,* 581 F.3d 399, 408 (6th Cir. 2009)).  Even if the ALJ's decision may be justified, it is imperative that the case be remanded to the Commissioner for proper analysis of Dr. Chao's opinions, notes, observations and conclusions as to the severity of Plaintiff's impairments and to what extent, if any,  the severity of Plaintiff's impairments affect  the determination of continued disability.

.     b.     DR. FISHER.

On the other hand, the ALJ's decision does speak to the factors in 20 C.F.R. § 404.1527(d) that must be assessed when discounting Dr. Fisher's opinions.  Initially, the ALJ acknowledged that mental and/or psychological impairments are not readily amenable to substantiation by objective diagnostic testing

and so he relied on the observation of Dr. Fisher in assessing improvement in the effects of psychotherapy. In fact, the principal evidence regarding Plaintiff's mental impairment after the disputed disability cessation date is contained in treatment notes of Dr. Fisher (Tr. 22). The ALJ did not discount Dr. Fisher's reports simply because of the lack of substantial documentation. The ALJ did, however, question Dr. Fisher's methodology since his treatment notes reflect minimal change in Plaintiff's symptoms and signs and Dr. Fisher's course of treatment.

The ALJ considered that Dr. Fisher had some difficulty keeping Plaintiff on his medications during several months when he failed to submit to treatment. Nevertheless, the ALJ was able to refute Dr. Fisher's opinions that Plaintiff had not improved with snapshots of Plaintiff's response to treatment suggesting that he was doing well, that he was not suicidal, that he was less depressed on medication and that his attitude had improved as a result (Tr. 643-647, 651-659, 678-679, 700-713).

And the ALJ's rejection of the disability conclusions by Dr. Fisher in favor of conclusions by a non-examining State agency medical professional as to his mental residual functional capacity has a basis for rejection on the ground that Dr. Fisher's conclusory finding that Plaintiff's condition has improved lacks connectivity to a finding that Plaintiff's ability to work is significantly impaired (Tr. 649-650). It is clear that Dr. Fisher's opinion that Plaintiff suffered from significant psychological limitations on his ability to work was excessive, conclusory, unsupported by the evidence and inconsistent with Plaintiff's testimony.

The ALJ met the "good reasons" standard by providing specific and legitimate reasons based on the evidence that support a rejection of Dr. Fisher's opinion. The ALJ's rationale is logical and substantial evidence in the form of Dr. Fisher's own treating notes, thereby yielding a substantial basis for the ALJ's failure to credit the opinions in their entirety.

31

2.      STATE AGENCY CONSULTANT STANDARDS.

Plaintiff attacks the State agency medical consultative examiners' reports because in general, they lack the complete record on which to base their analysis.

a.      THE LAW.

The regulations, 20 C.F.R. §§ 404.1527(e), 416.927(e), provide that the rules for considering medical and other opinions of treating sources and other sources also apply when the SSA considers the medical opinions of non-examining sources such as state agency medical and psychological consultants. In the Sixth Circuit, there are circumstances in which the opinions from State agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 409 (6thCir.2009) (*quoting* SOC. SEC. RUL. 96–6p, 1996 WL 374180, at *3 (July 2, 1996)).  One such circumstance may occur when the state agency medical consultant did not have the opportunity to review the entire treatment record.  *Id.*  Under *Blakley*, an ALJ may choose to credit the opinion of even a non-examining consultant who has failed to review a complete record, but the ALJ should articulate his or her reasons for doing so.  *Id.*  If the ALJ fails to provide sufficient reasons, the opinion still may be affirmed if substantial evidence supports the opinion and any error is deemed to be harmless or *de minimis*.  *Id.*

b.      THE RESOLUTION.

As a practical matter, the consultative examiner will not have the complete record when making a decision.  The language in the instant decision suggests that consistent with *Blakely,* the ALJ, at the very least, acknowledged that he considered the non-examining consultant who had failed to review a complete record and he explained his reasons for doing so (Tr. 21, 22, 24, 28).  The Magistrate finds that the ALJ's treatment of these reports does not constitute harmful error.

C.    **THE HYPOTHETICAL QUESTION.**

Plaintiff claims that the hypothetical question failed to incorporate allowances for gastric dumping and limitations in concentration, persistence or pace.

1.    **THE HYPOTHETICAL QUESTION STANDARD OF REVIEW**.

It is well-established that a hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant.  *Moore v. Commissioner of Social Security*, 2013 WL 6283681, *4 (N.D.Ohio,2013) (*See Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir.1987)).  Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant.  *Id.* (*See Blacha v. Secretary of Health & Human Services*, 927 F.2d 228, 231 (6th Cir.1990)).  In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible.  *Id.* (*citing Griffeth v. Commissioner of Social Security*, 217 Fed. Appx. 425, 429 (6th Cir.2007) (*citing Casey v. Secretary of Health & Human Services*, 987 F.2d 1230, 1235 (6th Cir.1993)).  However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence.  *Id.* (*See Newkirk v. Shalala,* 25 F.3d 316, 317 (6th Cir.1994)).

a.    **GASTRIC DUMPING**

Plaintiff argues that the ALJ failed to take into account his gastric dumping syndrome.  Dr. Horowitz diagnosed Plaintiff with gastric dumping on June 14, 2010 (Tr. 591).  The office notes of Drs. Chao and Fisher confirm that during the course of treatment, Plaintiff described various gastric issues that generally involved persistent diarrhea and nausea, all symptoms of the gastric dumping syndrome.  The Mayo Clinic describes a dumping syndrome as:

A group of symptoms that are most likely to develop in an individual whose stomach has been surgically bypassed to help lose weight.  The dumping syndrome occurs when the undigested contents of one's stomach moves too rapidly into the small bowel.  Some of the most common symptoms include abdominal cramps, nausea and diarrhea.  Http://www.mayoclinic.org/disease-conditions/dumping.

During the hearing, Plaintiff did not account for gastric dumping as a side effect of the surgery. He testified that his medication caused him to "go to the bathroom" (Tr. 750).  He did not elaborate as to the frequency with which he went to the bathroom or even suggest that he had other symptoms consistent with the dumping syndrome.  A fair reading of Dr. Horowitz's notes indicates that she conducted blood sugar testing to confirm the diagnosis (Tr. 581) and Dr. Chao suspected that Plaintiff's symptoms were suggestive of early dumping syndrome (Tr. 605).  Neither followed up on the severity of the syndrome, whether the symptoms improved and the effects of the dumping syndrome on Plaintiff's prospects for returning to work.  The reaction of both physicians was to refer Plaintiff to nutrition counseling where at the very least, he could alter his symptoms by making adjustments to his diet.  Neither physician took further action on treating this impairment.

The Magistrate reiterates that the ALJ need not include in the hypothetical question those restrictions which did not enjoy the support of objective medical evidence in the record.  Thus, the ALJ avoided incorporating an inaccurate and unsubstantiated depiction of Plaintiff's physical impairments.

b.     LIMITATIONS IN CONCENTRATION, PERSISTENCE AND PACE.

Plaintiff also argues that the ALJ's hypothetical question to the VE did not accurately reflect the extent of his mental impairment that the ALJ found to exist.

After reviewing the record, the Magistrate concludes that Plaintiff's argument that the ALJ failed to include all of Plaintiff's limitations in the hypothetical questions he put to the VE, lacks merit.  The ALJ took account of Plaintiff's "poor" ability to make occupational adjustment unless acting independently

34

when he posited that the individual could perform simple and more complex tasks in an environment without routine changes in work routine.  Implicit in the ALJ's inquiry was Plaintiff's limitations in maintaining concentration, persistence, or pace by including the restrictions that Plaintiff would use little if any judgment or make decisions; rather he was limited to performing only simple, routine repetitive tasks and only occasional changes in the work setting.  The ALJ explicitly included the moderate limitations in social functioning by asking the VE a hypothetical question that included the restriction that Plaintiff was limited to jobs that involved only occasional interaction with the general public and coworkers, a limitation that evidence supported.  Because the evidence showed that Plaintiff could perform simple, routine tasks, the ALJ's hypothetical question to the VE which included this limitation adequately addressed Plaintiff's limitations as to concentration, persistence, or pace.

Furthermore,  Dr. Fisher opined on December 2, 2011, that Plaintiff's concentration was poor, that his memory was impaired, that he was able to leave home and he was capable of functioning without special supervision, and he was not capable of sustaining work activity for eight hours per day for five days per week.  His opinion, however,  was inconsistent with his own medical records, which fail to suggest a cognitive malfunction or seriously impaired memory (Tr. 433-435, 495-495A, 642-647, 648-650, 678-679, 723-726).

The Magistrate finds no medical or testimonial evidence that Plaintiff's depression disorder affected his residual functional capacity in the manner that was expressed in the hypothetical, thus rendering his inquiry fatally inaccurate. The hypothetical questions accurately described Plaintiff's overall mental state. In sum, substantial evidence supported the ALJ's residual functional capacity assessment, and his hypothetical question to the VE included all of the limitations supported by the evidence.

35

C.      **OFF TASK BEHAVIORS.**

Plaintiff argues that the allowance for 5% of time off task is hardly sufficient to account for his limitations in concentration, persistence or pace.

Concentration, persistence, or pace refers to the ability of a claimant to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. 20 C.F.R. Part 404, Subpart P, Appx 1(Thomson Reuters 2014). Dr. Fisher opined that Plaintiff's attention and concentration for extended periods of two-hour segments as poor (Tr. 495-496, 649-650) and Dr. Semmelman opined that Plaintiff's attention fell within a normal range, he had no difficulties in maintaining concentration and his persistence and pace fell within the low average range (Tr. 468, 474). Dr. Pickholtz actually conducted a clinical mental status examination which more accurately described Plaintiff's ability to concentrate and his sustained ability to perform work-like tasks. Dr. Pickholtz assessed Plaintiff's concentration using tasks such as serial subtraction, short term memory tasks and sequencing. Based upon his assessment, Dr. Pickholtz  concluded that Plaintiff's levels of attention, concentration and persistence fell within the mild range of impairment (Tr. 456).

Finding minimal evidence of cognitive deficiencies affecting concentration, persistence and pace, the ALJ posited a hypothetical to the VE that presumed Plaintiff could perform complex tasks in environments where he would only undergo routine changes. The ALJ carefully introduced potential limitations affecting Plaintiff's ability to concentrate by considering that Plaintiff could work in an environment where he performed simple, routine tasks and had only occasional contact with the general public, co-workers and supervisors. To the extent that the limitations in cognitive functioning would address the ability to maintain concentration, persistence or pace, each job--inspection worker, assembler of small products and packer garment baggers--requires the performance of repetitive or short cycle work.

Once a small job is completed, Plaintiff will move onto the next task within the same occupational group. When read cumulatively, these limitations incorporate moderate concentrational, persistence or pace deficiencies that adequately capture any restrictions to Plaintiff's ability to sustain concentration, persistence or pace.

Plaintiff's assertion that the ALJ failed to propose a hypothetical question that adequately accounted for his time off task because of substantial limitations in concentration, persistence and pace assumes the existence of facts extrinsic to the evidence. Yet, there was no objective evidence to support even moderate limitations in concentration, persistence or pace. More important, the ultimate decision to discontinue benefits did not turn on the assessment of mild or moderate limitations in concentration, persistence and pace. Plaintiff's assertion that the ALJ failed to accurately frame his residual functional capacity based on substantial limitations in concentration, persistence and pace fails to accurately incorporate the limitations as reported in the medical record. .

     **d.**    **LEARNING DISORDERS.**

Plaintiff reiterated that as Dr. Pickholtz suggested, he has a history of learning difficulties. This factor was not considered by the ALJ in assessing residual functional capacity.

Residual functional capacity is a measurement of the most a claimant can do despite his or her limitations. See 20 C.F.R. § 416.945(a) (Thomson Reuters 2014). Residual functional capacity is to be determined by the ALJ only after he or she considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. § 416.929(a) (Thomson Reuters 2014).

None of the treating sources in the case produced a residual functional capacity affected by learning difficulties. The only such opinion is from Dr. Pickholtz who administered a mental status examination which yielded an estimated intelligence quotient falling within the low average range. Dr. Pickholtz

determined that Plaintiff's ability for mathematical capacities fell within the borderline range, that his ability to define words and recall a sequence of numbers fell within the low average range and that his ability to recall a long-term history based on common and historical information fell within the low-average range.

The Magistrate rejects the contention that the ALJ must explicitly determine the severity of his learning difficulties since this case turns on medical improvement. Based on all of the relevant evidence, the record lacks clear definition as to whether Plaintiff has a learning disability. When completing his disability report, Plaintiff claimed he completed the 12th grade and he was not in special education classes (Tr. 66). Dr. Semmelman suggested that Plaintiff's intelligence quotient was within the average range (Tr. 474). Dr. Pickholtz determined that Plaintiff's intelligence quotient fell within the low average range (Tr. 454). These sources suggest that Plaintiff's learning difficulty is mild at best. None of these sources concludes that Plaintiff cannot retain sufficient functional ability to perform specific work roles because of his learning disorder.

Arguably, Plaintiff's learning disorder has been accommodated by the unskilled parameter already provided in the residual functional capacity. Further, the limitation of simple, routine, jobs encompass limitations from a learning disability.

38

**X.  CONCLUSION.**

For the foregoing reasons, this case is reversed and remanded to the Commissioner pursuant to

sentence four of 42 U.S.C. § 405(g)  for appropriate analysis of the opinions, notes, observations and

conclusions  of  Dr. Chao, a treating physician, as to Plaintiff's impairments and the affect, if any, of Dr.

Chao's opinions on the determination of continued disability.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  August 28, 2014